IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA　　　)
　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　)　　　　　　CR. NO. 2:04cr228-F
　　　　　　　　　　　　　　　　)
ALBERT FORD　　　　　　　　　　)

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant Albert Ford's motion to suppress evidence – specifically, a Sig .45 caliber handgun found during an inventory search by police under the front seat of the vehicle driven by defendant.   For the reasons set out below, the court concludes that the motion to suppress is due to be denied.

Facts

On May 7, 2004, as Montgomery Police Department Sergeant Adrian Lisenby traveled northbound on Union Street near the intersection of Union and Upper Grove Street, he observed a pink Nissan Altima driven by the defendant pull off Upper Grove Street directly into his path.  Lisenby, who was riding a motorcycle, applied his brakes and backed away.  He saw that neither the driver nor the passenger in the Nissan was wearing a seat belt.  After he followed the car a few hundred feet, he smelled the odor of what appeared to be marijuana coming from the open windows of the vehicle at a distance of about a car length away.

Lisenby pulled the car over and approached the vehicle.  He saw the passenger

place a cellophane bag containing a green, leafy substance in his right hip pocket.  Lisenby asked the driver for his driver's license.  Defendant replied that he did not have a license. Lisenby got defendant's name and other pertinent information and returned to his motorcycle to call for another unit.  He ran the defendant's name and was informed that defendant's driver's license had been revoked.

Lisenby issued defendant citations for a seatbelt violation, driving while revoked, and no proof of valid insurance while he waited for the other unit.  When another officer arrived, the officers patted down the driver and the passenger and found a bag of crack cocaine, marijuana, and possibly powder cocaine on the passenger, who was arrested. Because the defendant's driver's license had been revoked, Lisenby decided to impound the car under the Safe Streets Act.[1]  As part of the impoundment process, Lisenby did an inventory search and found a Sig .45 pistol underneath the front driver's seat, as well as several steak knives.  He arrested the defendant for carrying a pistol without a license.

At some point before Lisenby left the scene and the car was towed, the owner of the vehicle, Kimberly Hooks, arrived and asked Lisenby to release the car to her.[2]  Lisenby told Hooks that the car was being impounded.  He did not release the car to Hooks because she

_____

[1]  The Safe Streets Act, Ala. Code §§ 32-5A-200-205, was repealed by Act 98-470, p. 909, § 2, effective May 1, 1998.  The statute to which Lisenby was referring is the Act's successor, Ala. Code §32-6-19(b), discussed *infra*.

[2]  Lisenby testified that "if I am not mistaken the wrecker was already on the scene or pulling up shortly after she got there, I don't recall."

did not have a valid driver's license or identification.[3]   Hooks does not possess a valid driver's license, but she does have a non-driver's identification card. When Hooks arrived on the scene, the neighbor who drove her there, Juanita Pecks, did have a valid driver's license.

Discussion

*Traffic Stop*

At the suppression hearing, defendant offered the following testimony based on reports of traffic enforcement activity by Lisenby from January 2004 to January 2005:

1.  Lisenby issued 61 Type C tickets for driving with a revoked or suspended license; 54 (88.5%) of those tickets were issued to black drivers.

2.  Lisenby issued 765 Type N tickets for other driving violations; 533 (69.6%) of those tickets were issued to black drivers.

3.  Lisenby impounded 13 cars for which the driver was listed; 7 (53.8%) of the drivers were black.

The court construes this evidence to raise a claim that Lisenby stopped defendant

---

[3] Lisenby initially testified at the hearing on the motion to suppress that he did not release the car to Hooks because she did not have a valid driver's license. Later in the hearing, Lisenby said that he did not release the car to the owner because she did not have a valid license or identification. Upon further questioning by the government, Lisenby acknowledged that he had not mentioned identification in his initial response. However, at the detention hearing in this case, which occurred prior to the suppression hearing, Lisenby did indicate that Hooks had no identification. He said at the suppression hearing that this prior testimony was accurate. Thus, the court understands Lisenby to maintain that he did not release the car to Hooks because she had no driver's license or identification.

on the basis of his race.[4]  However, any discriminatory intent by Lisenby, if proved,[5] would be irrelevant to the Fourth Amendment inquiry.  In <u>Whren v. United States</u>, 517 U.S. 806 (1996), the Supreme Court "held that the constitutional 'reasonableness' of a traffic stop is determined irrespective of 'intent,' either of the individual officer involved ... or any theoretical 'reasonable officer' (or, as the Court termed it, 'virtual subjectivity')."  <u>Riley v. City of Montgomery, Ala.,</u> 104 F.3d 1247, 1252 (11th Cir. 1997) (citation omitted). "The only question is whether the suspect's behavior gave rise to probable cause sufficient to justify the seizure." <u>Id</u>.  Thus, ulterior motives may not invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred. <u>United States v. Holloman</u>, 113 F.3d 192, 194 (11th Cir. 1997).

Accordingly, the only question before the court for purposes of examining the constitutionality of Lisenby's stop under the Fourth Amendment is whether Lisenby had

---

[4]  Although no testimony was elicited at the hearing concerning either the officer's or defendant's race, the court judicially knows that defendant is African American. Lisenby is white.

[5]  Lisenby was not asked at the hearing whether he knew that the driver was black before he made the stop, or whether he had any discriminatory intent in making the stop. He did testify generally concerning the way he approaches his job: "First car I come across that has a violation I make a traffic stop on.  Doesn't matter where I'm at ... ." Lisenby said that he takes a different route every day, except for special details. He testified that he does not issue a ticket every time he sees a traffic violation – "If I did that I wouldn't ever leave one road." Asked how he decides, when he sees a violation, which violations he would stop a car for, he responded: "I just stop cars. I don't understand why you are asking me that.  My job is traffic enforcement, that's what I do." With regard to the defendant, he said, "In this case right here I have already explained why I stopped Mr. Ford.  Mr. Ford pulled out in front of me, Mr. Ford did not have on a seatbelt, the vehicle was emitting a strong odor of marijuana from the vehicle. I think that's plenty enough of probable cause to stop a vehicle, don't you?"

probable cause to believe that a traffic violation or other criminal activity had occurred. See Draper v. Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004). In this case, it is undisputed that the driver pulled out in front of Lisenby, that neither occupant was wearing a seat belt, and that there was an odor of marijuana coming from the vehicle. The court finds, based on the testimony at the hearing, that Lisenby clearly had sufficient reasonable suspicion that a traffic violation had occurred and/or that criminal activity was in progress to stop the car lawfully.

Although the Supreme Court in Whren foreclosed any argument that the constitutional reasonableness of traffic stops under the Fourth Amendment depends on the actual motivations of the individual officers involved, the Court did agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. Whren, 517 U.S. at 813. However, as the Court noted, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Id.

Accordingly, the court has considered whether defendant's evidence regarding the relative proportion of black drivers versus white drivers who were ticketed for traffic violations, or whose cars were impounded, by Lisenby in 2004 is sufficient to establish a selective enforcement claim under the Fourteenth Amendment. Assuming, without deciding, that suppression of evidence is an appropriate remedy for an Equal Protection

violation in a criminal case,[6] the court cannot conclude that suppression is warranted in this case on selective enforcement grounds.

The requirements for establishing a selective enforcement claim are set out in the Supreme Court's discussion of selective prosecution in United States v. Armstrong, 517 U.S. 456 (1996); see also United States v. Smith, 231 F.3d 800 (11th Cir. 2000).[7]  "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  Armstrong, 517 U.S. at 463. "[T]he standard [for bringing a selective prosecution claim] is a demanding one."  Id.  A "presumption of regularity" supports prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.  Id.  Thus, in the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file, generally rests entirely in his discretion.  Id.; see also United States v. Cespedes, 151

_____

[6]  See, e.g., United States v. Navarro-Camacho, 186 F.3d 701, 711-712 (6th Cir. 1999) (Moore, CJ. concurring in the result)(Expressing the view that suppression of evidence is a viable remedy for an Equal Protection violation in the criminal context).

[7]  "Although courts sometimes use the terms selective prosecution and selective enforcement interchangeably, they are fundamentally different. Selective prosecution is a challenge to the prosecutor's decision whether and how to charge the defendant. Selective enforcement is a challenge to the actions of other state officers in determining against whom to enforce the laws." United States v. Garcia, 2000 WL 654377, *12, n. 9 (D.Del.2000).  Nevertheless, the basic elements of selective prosecution and selective enforcement claims are the same, although some courts have differed on the proof required to establish these elements (discussed infra).

F.3d 1329, 1332 (11th Cir. 1998).

However, the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification. <u>Armstrong</u>, 517 U.S. at 464. "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law." <u>Id</u>. at 464-65 (citation omitted). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" <u>Id</u>. at 465. The Eleventh Circuit has interpreted <u>Armstrong</u> "as requiring the defendant to produce 'clear' evidence or 'clear and convincing' evidence which is the same thing." <u>Smith</u>, 231 F.3d 800, 808 (11th Cir. 2000).

The court evaluates selective prosecution claims using "ordinary equal protection standards." <u>Id</u>. Specifically, "[t]he claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." <u>Id</u>. "The beginning step in comparing the prosecution of the defendants with the non-prosecution of those who were 'similarly situated' is to determine who, if anyone, was similarly situated with the defendant[]." <u>Id</u>. at 810. The Eleventh Circuit has defined a "similarly situated" person for selective prosecution purposes "as one who engaged in the same type of conduct, which

means that the comparator committed the same basic crime in substantially the same manner as the defendant--so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan--and against whom the evidence was as strong or stronger than that against the defendant." Id.[8]

Defendant's statistical evidence fails to carry his heavy burden under Armstrong. Defendant has not identified any non-black comparator who engaged in the same type of conduct as defendant and whom Lisenby did not pull over, or whose car Lisenby did not impound.    Nor has defendant offered any evidence – even without naming specific comparators – that Lisenby does not stop whites, and impound their vehicles, under similar circumstances.    Further, even if defendant could establish discriminatory effect using statistical evidence alone, the statistics that he has offered are insufficient for that purpose. For example, he has not provided the court with any way to determine how the proportion

_____

[8] Some courts have determined that, "[i]n the context of a challenged traffic stop, ... imposing the similarly situated requirement makes the selective enforcement claim impossible to prove. It would require the defendant to make a credible showing that a similarly situated individual was not stopped by the law enforcement." United States v. Duque-Nava, 315 F.Supp.2d 1144, 1154 (D. Kansas 2004); see also Chavez v. Illinois State Police, 251 F.3d 612, 637 (7th Cir.2001). But see Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir.2003); Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir.2000). The Duque-Nava court, for example, reasoned that in the traffic context, "[i]t is virtually impossible to identify a 'similarly situated' individual who was not stopped." Id. at 1155. "Thus, the defendant challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way." Id.  The court allowed the defendant to demonstrate discriminatory effect either by showing a similarly situated individual, or by relying on statistical evidence. Id. So far as this court can determine, the Eleventh Circuit has not relieved defendants of the requirement of identifying similarly situated individuals in selective traffic enforcement claims.

of African Americans ticketed or towed by Lisenby compares with the proportion of African Americans in the relevant pool of drivers, whether that group is defined as the Montgomery driving population at large, the driving population who receive Type C or Type N tickets, the driving population whose licenses have been revoked, or the driving population whose cars have been impounded. In short, the court simply has no analytical basis for inferring discriminatory effect in this case.

Not only does defendant fail to prove by clear and convincing evidence that there were similarly situated white individuals who were not ticketed or towed, thereby failing to establish discriminatory effect, he also has not proved discriminatory intent by clear and convincing evidence. Under relevant Supreme Court precedent, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977). The impact of the official action (whether it bears more heavily on one race than another) may provide an important starting point. Id. Among other relevant considerations are the historical background of the challenged decision, the sequence of events leading up the decision, any significant substantive or procedural departures from the ordinary course of events, and contemporary statements. Id. In this case, defendant has presented no direct evidence, and insufficient circumstantial evidence, on which to base a finding of discriminatory intent. Accordingly, defendant has failed to meet his heavy burden to

overcome the presumption of regularity that attaches to Lisenby's decisions, and his selective enforcement claim is without merit.

*Impoundment*

Defendant contends that the gun found during the inventory search should be suppressed because Lisenby failed to follow proper impoundment procedures in this case, he made the impoundment decision "in about two minutes," and he should have released the car to the owner or her friend rather than impounding the car.

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987). "The policies behind the warrant requirement are not implicated in an inventory search, ... nor is the related concept of probable cause ... ." Id. Thus, "[e]ven if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of 'something other than suspicion of evidence of criminal activity.' If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria. Because an inventory search is an exception to the Fourth Amendment's warrant requirement, however, the government officer has the burden to show that the requirements of the inventory search exception have been met." Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992).

In this case, Lisenby impounded the vehicle driven by the defendant pursuant to Ala. Code §32-6-19(b). That section provides that:

> … any person who operates a motor vehicle upon the highways of this state while his or her driver's license or driving privilege is revoked for any reason under the laws of this state or similar laws of any other state or territory … shall be immediately removed from the vehicle. The vehicle, regardless of ownership or possessory interest of the operator or person present in the vehicle, except when the owner of the vehicle or another family member of the owner is present in the vehicle and presents a valid driver's license, shall be impounded by any duly sworn law enforcement officer. If there is an emergency or medical necessity jeopardizing life or limb, the law enforcement officer may elect not to impound the vehicle.

Id. Ala. Code § 32-6-19(c)(1) further provides that "[t]he law enforcement officer making the impoundment shall direct an approved towing service to tow the vehicle to the garage of the towing service, storage lot, or other place of safety and maintain custody and control of the vehicle until the registered owner or authorized agent of the registered owner claims the vehicle by paying all reasonable and customary towing and storage fees for the services of the towing company. The vehicle shall then be released to the registered owner or an agent of the owner."

This statute, which was binding on Lisenby (and all other Montgomery police Department officers) constitutes "standard criteria" for purposes of the inventory search exception to the warrant requirement. The government established that the decision to impound in this case was made on the basis of this statute – that is, on something other than suspicion of evidence of criminal activity.  As Lisenby testified, "[i]n the State of

Alabama the Safe Street Law applies to driver who are driving with a revoked driver's license ... . Under state law we are to impound the vehicle under the Safe Streets Act."

Defendant's contention that Lisenby's decision to impound the vehicle was made in "about two minutes," even if true, does not compel the conclusion that his decision was unlawful. Lisenby, a supervisor in the traffic division, had been on the police force for some 17 years, and had been assigned to the traffic division for approximately 12 years, when he made the traffic stop at issue in this case. It appears to the court that an experienced officer could reasonably decide to impound a car driven by someone with a revoked driver's license in very short order, in the absence of any owner (or family member of an owner) presenting a valid driver's license. Further, it is not at all clear that Lisenby's decision was made as quickly as defendant suggests.[9] According to the testimony and the exhibits introduced at the hearing, the "event" (that is, the traffic stop) began at 6:49 p.m. Lisenby received an impound number at 7:11 p.m., and the car was released to the wrecker at 7:17 p.m. Although no testimony pinpointed the exact time at which Lisenby called for the impound number, there was apparently a 22-minute interval between the time that he initiated the stop and his receipt of that number.

Defendant's contention that some of the documents associated with the impound contained inaccuracies is also unavailing. The Vehicle Impound Report for this incident

---

[9] In fairness to defendant, it may have been Lisenby who suggested the two-minute time period. He testified that the average traffic stop took him about two to three minutes, depending on how many tickets he wrote.

(Defendant's Exhibit 11) failed to indicate one way or another whether this was a "Safe Streets impound" – that is, neither the word "yes" or "no" was circled on the form – and an incorrect reason for impoundment was given on the form – that is, "subject arrested." However, Lisenby testified that another officer filled out this form at his direction because he was occupied with other matters, and the other officer's failure to indicate that this was a Safe Streets impound appears to have been inadvertent.[10]  While it is true that the Montgomery Police Department's standard operating procedure for impounded vehicles (Defendant's Exhibit 12) indicates that "accuracy is of the utmost importance throughout the impounding procedure," the court cannot conclude that this accidental deviation from the policy is material.  As Lisenby said, referring to other officers who have filled out impound forms, "the majority of my officers are senior officers, they pretty much know what they're doing, and everybody is entitled to make a mistake from time to time."[11]

Finally, defendant's suggestion that Lisenby should have released the car to the owner or her friend rather than impounding it fails to establish that the gun found in the inventory search should be suppressed.  This true for several reasons.  First, under the terms of the relevant statute, Lisenby was required to impound the vehicle "regardless of ownership or possessory interest of the operator or person present in the vehicle, except

---

[10]  The entry indicating that defendant was arrested was true, but the arrest occurred after, and as the result of, the inventory search.  This sequence of events may have caused the confusion.

[11]  The court finds that the other errors cited by defendant – the fact that Lisenby's name was misspelled on this report, and the fact that another officer signed Lisenby's name on a daily enforcement report (Defendant's Exhibit 10) – also are not material.

when the owner of the vehicle or another family member of the owner is present in the vehicle and presents a valid driver's license... ." Ala. Code §32-6-19(b). In this case, it is undisputed that the owner, Kimberley Ross, did not present – because she did not have – a valid driver's license, and that her neighbor, Juanita Pecks – who did have a valid license – was not a family member of the owner. Accordingly, under the express terms of the statute, Lisenby was required to impound the car.

Second, assuming that Lisenby could have given Hooks an opportunity to make alternative arrangements, the Fourth Amendment did not require him to do so. See Bertine, 479 U.S. at 373-74 (While giving defendant an opportunity to make alternative arrangements would have been possible, the real question is not what could have been achieved, but whether the Fourth Amendment requires such steps. The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means.); United States v. Davis, 882 F.2d 1334, 1339 (8th Cir. 1989) (Rejecting argument that defendant should have been offered the opportunity to make other arrangements for the safekeeping of his property.). See also Sammons, 967 F.2d at 1539-1543 (11th Cir. 1992) (discussing cases in which courts declined to hold that the existence of alternative, less intrusive means of dealing with an automobile illegitimated the decision to impound it, so long as police acted reasonably with regard to disposition of the vehicle.).

Finally, the court notes that Hooks testified that Lisenby told her that she could not

have the car because a pistol had been found in it.   If Hooks' testimony is true,
suppression of the weapon is not required in any event on account of Lisenby's failure to
release the car to Hooks, since the inventory search was apparently conducted, and the
pistol found, prior to Hooks' request for release of the car.   In summary, absent  any
showing that Lisenby , who was following standardized procedures, acted in bad faith or
for the sole purpose of investigation, the court finds no Fourth Amendment violation here.

Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the
Magistrate Judge that defendant's motion to suppress be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said
Recommendation on or before July 17, 2005.   Objections must specifically identify the
findings in the Magistrate Judge's Recommendation objected to.   Frivolous, conclusive or
general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in
the Magistrate Judge's report shall bar the party from a de novo determination by the
District Court of issues covered in the report and shall bar the party from attacking on
appeal factual findings in the report accepted or adopted by the District Court except upon
grounds of plain error or manifest injustice.   Nettles v. Wainwright, 677 F.2d 404 (5th Cir.
1982).   See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).   See also Bonner

v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 5th day of July, 2005.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE